**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 22 Cr. 117 (RDM)** |
| **DONALD HAZARD,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Donald Hazard to a term of incarceration of 57 months, three years of supervised release, restitution to be determined at a later date, a $450 fine, and the mandatory $100 special assessment for the count of conviction.

## I.    INTRODUCTION

The defendant, Donald Hazard participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

In the weeks leading up to January 6, 2021, Hazard, with encouragement and assistance from his co-defendant Lucas Denney, acquired protective gear and weapons, recruited comrades in arms, and arrived in Washington, D.C. eager for violence.   On January 6, as police officers attempted to hold back rioters from breaching the Capitol, Hazard engaged with them, grabbing an officer, pulling him down a set of concrete steps, and falling on top of another officer.   One of those officers sustained extensive, significant, and long-lasting injuries.   Hazard continued to confront officers on the west side of the Capitol, yelling at them and spraying a chemical substance at them.   He then entered the Capitol building, proclaiming that he was "storming" the Capitol. In the days that followed, Hazard erased the videos and pictures that he had taken on January 6, and bragged about his participation in the riot.

The Government recommends that the Court sentence Hazard to 57 months' incarceration for his conviction of violating 18 U.S.C. § 111(a) and (b), a sentence at the low end of the Guidelines range contemplated by the plea agreement in this matter.   Such a sentence reflects the seriousness of Hazard's criminal conduct, including the grave injuries he caused.   It also takes into consideration the sentence imposed on Hazard's co-defendant, Lucas Denney, who had a more extensive role in preparation and recruitment efforts, including fundraising, in anticipation of January 6, but whose conduct that day did not directly inflict severe injury.

## II.      FACTUAL BACKGROUND

### A.      The January 6, 2021 Attack on the Capitol

The government refers the court to the stipulated Statement of Offense filed in this case, ECF 35, and the draft Presentence Investigation Report ("Draft PSR") ECF No. 37 at ¶¶ 10-16 for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of

rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### *Attempted Breach of the Capitol Building and Assaultive Conduct on the West Front of the Capitol Grounds*

Assaults against police on the West Front of the Capitol Grounds made the rioters' entry into the United States Capitol Building on January 6, 2021, possible.   Initiated by the most fervent smaller groups and individuals within the crowd and using the mob itself as a cloak for their actions, each blow helped the crowd penetrate further into the United States Capitol Police ("USCP")'s defenses until the building itself was accessible and the occupants were at risk.   The physical breaches of the building can therefore be traced directly back to the assaultive conduct on the grounds of the West Front.



*Exhibit 1: Open-Source Rendering of Capitol Building and Grounds as they appeared on January 6, 2021, credited to Twitter users @ne0ndistraction & @sansastark525.*

The outer perimeter of the Capitol Grounds, made up of bicycle-rack style fencing, bore numerous signs stating, "AREA CLOSED – By order of the United States Capitol Police Board[.]" These fences were not actively manned, but members of the USCP were stationed nearby as well as patrolling throughout the grounds.   At approximately 12:45 p.m., a crowd began to gather against the barricades near the Peace Monument, in the Peace Circle, which led to the Pennsylvania Walkway.   Seeing this, a half dozen USCP officers began to gather behind what is labeled in Exhibit 1 as "1st Police Barricade," circled in red and marked as Area A.   At 12:52 p.m., the first breach of the outer perimeter occurred, with several members of the crowd jumping over and pushing down the unmanned bicycle-rack barricades at the Peace Circle and advancing into the

restricted area to engage with USCP officers at the first manned barrier.   Less than a minute later, with the crowd already numbering in the hundreds, the handful of USCP police officers in and around the barrier were shoved out of the way by the mob.   By 12:58 p.m., the rioters had crossed the unmanned barrier halfway down the Pennsylvania Walkway and overwhelmed the second manned police barrier, Area B in Exhibit 1.   They flooded the area labeled "Lower West Plaza" Area C on Image1, pushing against the barricade there.



*Exhibit 2: Stills from USCP security footage showing the progression of the crowd, from the outer barricades (top left), to the first manned police barricade (top right), to engaging with USCP at the second manned police barricade (bottom left), and beginning to fill the Lower West Plaza (bottom right).*

Despite the more-permanent nature of the metal fencing at the West Plaza barricade and the growing number of USCP officers responding to the area, the crowd remained at this location for less than a minute, pushing through and over the fence to the front of the plaza.   For the next hour and a half, a growing number of police officers were faced with an even faster growing number of rioters in the restricted area, the two sides fighting over the establishment and reinforcement of a police defensive line on the plaza with fists, batons, makeshift projectiles,

pepper spray, pepper balls, concussion grenades, smoke bombs, and a wide assortment of weaponry brought by members of the crowd or seized from the inaugural stage construction site.



*Exhibit 3: The breach of the West Plaza barricades (top left) was followed by the formation of a USCP officer wall (top right) until MPD officers arrived with bike rack barriers for a defensive line at the top of the West Plaza stairs (bottom left).   In the photo of the nearly completed bicycle rack barrier line as of 1:39 pm, a large Trump billboard which would later be used against the police line like a battering ram is visible (bottom right).*

Following the conclusion of President Trump's speech at approximately 1:15 p.m., the crowd began to grow even more rapidly, supplemented by those who had walked the mile and a half from the Ellipse to the Capitol.   At 2:03 p.m., Metropolitan Police Department (MPD) officers responding to USCP officers' calls for help began broadcasting a dispersal order to the crowd.   It began with two blaring tones, and then a 30-second announcement, which was played on a continuous loop:

> This area is now a restricted access area pursuant to D.C. Official Code 22-1307(b). All people must leave the area immediately.   This order may subject you to arrest and may subject you to the use of a riot control agent or impact weapon.

Despite the warning and the deployment of riot control agents and impact weapons, few members of the crowd left.   On the contrary, the mob in the restricted area continued to grow as crowds

streamed towards the West Front, which looked like a battle scene, complete with an active melee and visible projectiles.

On the north side of the West Front was a scaffolding erected for the inauguration, wrapped in a white tarp.   The scaffolding covered a two-level set of stairs leading from the west side of the Capitol to the Upper West Terrace of the Capitol building – Area D in Exhibit 1, above.   Rioters flowed from the West Front into the area under the scaffolding, where they were held back by a line of metal bike racks, temporary doors, and USCP officers.   By approximately 2:10 p.m., however, rioters broke through this weak spot in the Capitol's intermediate defensive line, surging up to the stairs to the area immediately surrounding the Capitol building, which was breached at approximately 2:13 p.m.

After having actively defended their line on the West Front for over an hour, the hundreds of officers at the front of the inauguration stage were flanked, outnumbered, and under continuous assault from the thousands of rioters directly in front of them as well as members of the mob who had now climbed up onto scaffolding above and to the side of them, many of whom were hurling projectiles.   Because many of the thousands of people surrounding the officers were not engaged in assaultive conduct, it was difficult for officers to identify individual attackers or defend themselves.   By 2:28 p.m., with their situation untenable and openings on the stairs under the scaffolding having already led to breaches of the building, several large gaps appeared in the police defensive line at the West Front and a general retreat was called.   With their defensive lines extinguished, several police officers were surrounded by the crowd.   The rioters had seized control of the West Plaza and the inauguration stage.   There were now no manned defenses between the crowd and several entrances into the United States Capitol Building, allowing the

stream of rioters that had started entering the building around 2:13 p.m. to build to a torrent.



*Exhibit 4: Breakthroughs in the defensive line on both the left and right flanks (top) caused the entire police line to collapse and individual officers were swallowed by the crowd (middle) and many officers were assaulted as they waited in a group to retreat through doors and stairwells up onto the inaugural stage (bottom).*

B.      **Donald Hazard's Role in the January 6, 2021 Attack on the Capitol**

*Preparations for January 6, 2021*

Hazard and Denney were members of a Texas-based militia called the Patriot Boys of North Texas ("PBONT").   Throughout December 2020 and early January 2021, Denney procured weapons and gear in preparation for the "Stop the Steal" rally in Washington D.C., recruited others to join him in traveling to (and arming for) the rally, and raised funds to do so.   On December 25, 2020, Denney, the self-proclaimed President of PBONT, sent a Facebook message to Hazard, asking if he could travel with Denney to Washington, D.C. from January 5 through 7.   Denney appointed Hazard as the sergeant-at-arms of PBONT, explaining his duties were to "watch[] the president's back. Kinda like security."

Denney encouraged Hazard to recruit others to join them, telling Hazard on December 26, "If you know any other guys that can go thats like us an will fight we could use them."   Denney also urged Hazard to acquire weapons and protective gear in advance of January 6, and assisted him in doing so.   For example, between approximately December 30, 2020 and January 1, 2021, Denney and Hazard engaged in the following exchange over Facebook messenger:

| | |
|---|---|
| **Denney:** | January 6th.   It begins brother |
| **Hazard:** | Can't wait!!! |
| **Denney:** | Do you have to work Saturday? |
| **Denney:** | If you're off then <u>I want to pick you up and take you to get a helmet and pic up some other gear.</u>   We also have a [PBONT] chapter meeting at 4pm in the Stockyards.   You can stay with me Saturday night because we are gonna leave Sunday and head out.   We have 3 guys so far.   But we are meeting hundreds of others at our hotel. |

9

|  | *     *     * |
|---|---|
| **Denney:** | <u>Just picked us each up a bottle of police grade pepper spray form the Fort Worth police store.  I'm gonna have you a vest to.</u> |
| **Hazard:** | Alright!!! |
|  | *     *     * |
| **Denney:** | We got to go out tomorrow and get you a helmet for yo head. |

(emphasis added).

Hazard eagerly undertook his assignments.  On or about January 2, 2021, he engaged in the following exchange over Facebook messenger with another Facebook user ("Individual-1"):

| **Individual-1:** | Hazard are you going to dc |
|---|---|
| **Hazard:** | Yeah we leave in the morning. |
| **Hazard:** | Wanna go bust some head's with us?? |
| **Individual-1:** | Let me see if I can get off work I will drive |
| **Hazard:** | We probably got body armor for you and probably a pair of knuckle gloves. You'll want a helmet and maybe eye protection. And unfortunately DC is a very liberal place with terrible gun laws. So we are having to leave all guns here in Texas. |
|  | *     *     * |
| **Individual-1:** | Are you ready? |
| **Hazard:** | Yeah brother I'm ready. I got a helmet today I got knuckle gloves I got goggles I got a body armor. And I just checked we have a helmet for you we have gloves we have body armor only thing you might need is some safety glasses. And Luke said you're more than welcome to drive and meet us out there or you're more than welcome to just jump in with us tomorrow at 9 a.m. and head out there with us. But like I said earlier and he said the same thing we'd love to have you. |
| **Hazard:** | We also have a patriot boys hoodie for you. Which is uniform. |

**Hazard:**



**Hazard:**



**Hazard:**      Our militia group is called the Patriot boys. We're directly affiliated with the proud boys. So we have literally thousands upon thousands of members backing us up.

                    *       *       *

**Hazard:**      Friend request Lucas denny. He's the president of this chapter and I'm riding out there with him.   I won't have phone service so friend request him so that we can stay in communication.

The next day, Hazard bragged to another Facebook user ("Individual-2"), "I got a helmet knuckle gloves goggles to protect my eyes and body armor."

Hazard not only understood that he and Denney were gathering these supplies in anticipation of violence, he expressed excitement about the possibility.   As detailed above, when he was pitching the trip to Individual-1, he asked if Individual-1 wanted to "go bust some head[]s with" him and Denney.   He repeated this sentiment on several occasions, posting Facebook comments such as:

- "So in Washington DC [they have] BLM Plaza.   <u>Our goal is to take several</u>

11

thousand militia guys down there and kick them out of their own Plaza and take total control of it."

- "Joe Biden Kamala Harris and the whole Democratic Party are nothing but a bunch of worthless communist whose sole purpose is nothing but to do away with the Constitution and take all of our freedoms away.   They've made it perfectly clear they're rolling with black lives matter and antifa thugs. Well I'm rolling with a bunch of patriot militia men. So Uncle Joe I'm heading out to DC tomorrow. And you can bet I'm gonna bust as many antifa and BLM skulls as I possibly can for you.   So much love for you even though in this fight between good and evil. You sir are on the wrong side."

- "And as for militia groups. The one I'm in is all about the Constitution so make no mistake about that. Also we have sat by and tried to be peaceful while watching antifa and BLM terrorize America with no repercussions.   So the time to sit back and be peaceful is over. There's a Civil War coming and I for one will be on the front lines taking out as many of those sons of bitches as I possibly can."

(emphasis added).

### *Hazard's Assaults on Police Officers and Unauthorized Entry into the Capitol Building*

Hazard's promises of violence were borne out.   On January 6, 2021, he wore a tactical vest[2] and a black helmet with an image of the confederate battle flag on the side.   As Hazard marched towards the Capitol, he was filmed by a newspaper photographer.   In the video, Hazard stated, "Make sure you get my face and everything on your news channel. I want the enemy to know exactly who is coming after them:"

---

[2] When he was interviewed by the FBI following his arrest, Hazard told the agents that he had worn body armor loaned to him by Denney.



*Exhibit 5: Still image from video posted by* The Washington Post*, available at*
*https://www.washingtonpost.com/video/opinions/how-the-capitol-attack-unfolded-from-inside-trumps-rally-to-the-*
*riot-opinion/2021/01/12/a7146251-b076-426e-a2e3-8b503692c89d_video.html, at 01:41*

By approximately 2:00 p.m., Hazard had entered the restricted grounds of the Capitol and was positioned under the scaffolding that had been erected over the stairs on the northwest side the of the Capitol building (Area D depicted in Exhibit 1, above).   USCP officers, including Officer T.S., Technician T.L., and Sergeant T.L., were positioned on a landing at the mid-point of the stairs, where a set of metal doors had been erected.   As rioters approached, USCP officers attempted to close the doors, but rioters climbed the scaffolding and were able to pass the officers. Hazard and others attempted to climb up the stairs; as Hazard attempted to get past Officer T.S., the officer engaged Hazard in order to force Hazard back.

Technician T.L. recalls watching as Hazard grabbed Officer T.S., pulling Officer T.S. down the stairs with him as Hazard fell.   Hazard continued to fight with Officer T.S. as the two fell down the stairs.   As a result of the fall, Officer T.S. hit his head and was knocked unconscious.

13

Hazard also fell on top of Sgt. T.L., who hit his head on the concrete.   Technician T.L., who lost his balance and also fell down the stairs, attempted to shield Officer T.S.'s service weapon because he was concerned that Hazard, who had his arms wrapped around Officer T.S., or other rioters might grab it.   As Hazard wrestled with Officer T.S. and Technician T.L. on the landing of the stairs, other rioters sprayed Officer T.S. and Technician T.L. with a chemical substance. [3] Eventually, other officers were able to pull Technician T.L. and Officer T.S. from the crowd and they were brought inside of the Capitol building for medical assistance.   Technician T.L. recalls hearing a radio call that the Capitol building had been breached shortly thereafter.

        Because of the location of the assault – under scaffolding that was not a regular structure at the Capitol – and the fact that USCP officers were not wearing body-worn cameras ("BWC"), the assault itself was not captured by USCP surveillance cameras or BWC.   A reporter for *The New Yorker* briefly captured the aftermath, depicted in Exhibit 6. [4]

---

[3] Technician T.L. believes this substance was bear spray.   Officer T.S. believes it was a combination of bear spray, pepper spray, and CS gas.   Both officers were temporarily blinded.

[4] Exhibit 6 is an excerpt from a longer video, available at https://www.youtube.com/watch?v= 270F8s5TEKY.   All video exhibits will be provided to the Court and opposing counsel via USAfx.

14



*Exhibit 6A: Still image from the* New Yorker *video footage.*
*Hazard is circled in red, Officer T.S. is circled in yellow, and Sgt. T.L. is circled in green.*



*Exhibit 6B: Still image from the* New Yorker *video footage.*
*Hazard is circled in red, Technician T.L. is circled in blue, and Sgt. T.L. is circled in green.*
*Officer T.S. is behind and underneath Hazard.*

By approximately 2:09 p.m., Hazard and Denney were positioned on the west side of the Capitol building, where police officers were attempting to maintain a bike rack barricade.  As other rioters pulled at and shook the barricade, Denney punched at an officer's face.  Another officer deployed crowd control spray, and Hazard and Denney retreated into the crowd.  *See*

Exhibits 7 and 8.



*Exhibit 7A*

Less than a minute later, Hazard and Denney returned to engage with the line of police officers.  In particular, Hazard, raised both of his middle fingers towards the line of officers, slapped the tactical vest he was wearing, and yelled "We're patriots, motherfucker!  Fuck you!

17

You're bought out by China, you communist fuck!   This is America!"



*Exhibit 7B*

Hazard and Denney continued to engage with police officers on the west side of the Capitol.

Shortly after the incident described above, Hazard and Denney were captured on video advancing

towards the line of police officers, each with an arm raised, holding what appear to be cannisters

of pepper spray.   After a few seconds, Denney threw his cannister in the direction the line of

officers.   *See* Exhibits 9[5] and 10.[6]



*Exhibit 9A*

---

[5] Exhibit 9 is an excerpt from a video that was obtained from the cellphone of another rioter and does not contain a timestamp.

[6] Exhibit 10 is an excerpt from a 20 minute, 19 second video posted to YouTube with the title "Capitol Protest in Washington, D.C. on January 6, 2021," available at https://www.youtube.com/watch?app=desktop&v=9mt8YGpJ5vs.



*Exhibit 9A (zoomed in)*



*Exhibit 10A*



*Exhibit 10A (zoomed in)*

At approximately 2:56 p.m., Hazard entered the Capitol building via a door on the northwest side of the first floor – the "Parliamentarian Door."   In the hallway immediately inside the door, Hazard assisted another rioter in rinsing out his eyes with water. Hazard briefly entered the Senate Parliamentarian's office, then continued down the hallway, further into the building.



*Exhibit 11A*                    *Exhibit 11B*

After several minutes, police officers began to corral the crowd of rioters back towards the Parliamentarian Door.   Several officers turned into the Senate Parliamentarian's office and instructed rioters to leave.   At approximately 3:01 p.m., Hazard was captured by an MPD officer's

body-worn camera, bending down as if to pick something up and then exiting the office, as depicted below.



*Exhibit 12*

Hazard, along with other rioters, was then pushed out the Parliamentarian Door by police

officers.



*Exhibit 13*

When he reached the exterior steps, Hazard raised his arms in a gesture of victory:



*Exhibit 14*

*Defendant's Statements*

Throughout the day on January 6, 2021, Hazard filmed several "selfie-style" videos, which he posted to Facebook on January 6 and 7, 2021.   Those videos include:

- A video that appears to have been filmed in the vicinity of the scaffolding over the stairs on the northwest side of the Capitol.   In that video, Hazard stated, "What up everybody back home? We're here at the nation's capitol and we're storming it. We're taking the Capitol. Shit is real here. This is America baby."   (Exhibit 15.)

- A video that appears to have been filmed immediately outside an entrance to the Capitol building.   In that video, as other rioters chanted "our house!" Hazard stated, "We are storming our nation's capitol.   This is America.   Look at all these patriots.   We are storming the fucking Capitol."   (Exhibit 16.)

- A video that appears to have been filmed in an interior hallway of the Capitol building.   In that video, as other rioters chanted "Whose house?   Our house!" Hazard stated, "So you want to be a Patriot? This is what it looks like.   We have stormed our nation's capitol.   We're in. Look at all these good patriots here.   I've been maced.   I've been beat up by cops. Shit's getting real here in D.C."   (Exhibit 17.)

In the days following January 6, Hazard continued to brag about his participation in the riot at the Capitol.   For example, between the late evening of January 6, 2021 and January 7, 2021, Hazard posted the following comments on Facebook:

- "1st time since the 1800s!!! Now they knowlike   the Patriots are pissed!!!"

- "[I]t wasn't easy at all.   I had to fight several cops.and didn't make it on my 1 st attempt.   I charged the cops and got in a fight with   a lot of them.   I got beat up and beat with they're clubs and maced.   But the 2nd time I won!!

- "[I]f you're a patriot then you would realize we made a huge bold statement today.   And that statement is the Patriots have had enough!!! Make no mistake about it.   What we did today was totally epic!!! We took over the capital and had Democrat politicians hiding like the cowards they are.   And Mike pence is a coward 2.   He had to run away through an underground tunnel and be flown away.   We made history today.   The capital hasn't been taken since the 1800s. Until we came to town."

- "I'm fantastic!! The way I see it .it was an honor to be here and be apart of something so epic!!! And If I died here today   it would be an honor as well!!!!"

- "I'm beat up been maced gased had flashbang grenades thrown at me beat down by the cops. But I'm blessed and wouldn't have it any other way."

- "We the people had an election stolen from us so we took our capital/NOT THERE's back. IF THIS WAS BACK IN THE DAY OUR FORFATHERS WOULD HAVE STORMED IN AND DRUG POLITICANS OUT AND HUNG THEM FOR TREASON."

- "[W]ell Mike Pence had to run and hide underground and be helicoptered out so. I'd say we made a f****** point.!!!"

### *Deletion of Evidence*

During a post-arrest interview with the FBI, Hazard informed agents that, after he returned to his hotel room on January 6, 2021, he erased all of the videos that he had taken of himself at the Capitol from his cellphone.   This is consistent with a Facebook message that he sent on January 14, 2021, in which he stated "I found out the worst I could be facing was a misdemeanor.   Now I wish I hadn't erased my pics and videos."

### *Officer T.S.'s Injuries*

As a result of Hazard's assault, Officer T.S. was treated for a concussion, injuries to his foot, and bruising to his arm.   The injuries to Officer T.S.'s foot required multiple surgeries

## III.     THE CHARGES AND PLEA AGREEMENT

On April 1, 2022, a federal grand jury returned an indictment charging Hazard with 10 counts, including a violation of 18 U.S.C. §§ 111(a)(1) and (b) and 2 (Assaulting, Resisting, or Impeding Certain Officers or Employees and Inflicting Bodily Injury).   On, February 16, 2023, Hazard was convicted of that offenses based on a guilty plea entered pursuant to a plea agreement.

## IV.     STATUTORY PENALTIES

Hazard now faces sentencing on one count of Assaulting, Resisting, or Impeding Certain Officers, Inflicting Bodily Injury, in violation of 18 U.S.C. § 111(a)(1) and (b).   As noted in the Plea Agreement and the Presentence Report issued by the U.S. Probation Office, Hazard faces up to 20 years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000 or twice the gross pecuniary gain or loss of the offense, and a mandatory special assessment of $100.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Government disagrees with the Guidelines calculation in the draft PSR with respect to one enhancement.   The Plea Agreement contains the following calculation:

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a) | Base Offense Level | **14** |
| U.S.S.G. § 2A2.2(b)(3)(E)[7] | Serious to Permanent or Life-Threatening Bodily Injury | **+6** |

---

[7] The draft PSR correctly noted that the Plea Agreement erroneously cited to U.S.S.G. § 2A2.2(b)(3)(B) instead of § 2A2.2(b)(3)(E).   Draft PSR ¶ 6 n.2.

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(7) | Conviction under 18 U.S.C. § 111(b) | **+2** |
| U.S.S.G. § 3A1.2(b) | Official Victim | **+6** |
| | **Adjusted Offense Level** | **28** |
| | | |
| U.S.S.G. § 3E1.1(a)-(b) | Acceptance of Responsibility | **-3** |
| | **Total Offense Level:** | **25** |

*See* Plea Agreement, Section 4.A.   The draft PSR, however, adds an additional two points, pursuant to U.S.S.G. § 2A2.2(b)(1), because Hazard engaged in "more than minimal planning" by engaging with others regarding his travel to Washington, D.C., obtaining gear, and attempting to recruit others to join him and Denney.   Draft PSR ¶ 43.

This enhancement was appropriately applied to Hazard's co-defendant, Lucas Denney.   In support of this application, the Government cited not only Denney's extensive planning and recruitment of others, including Hazard, but also his fundraising for supplies that would be needed in the event of violent conflict, including helmets, vests, pepper spray, and medical supplies, as well as lodging and travel costs.   *See United States v. Lucas Denney*, 22-cr-70 (RDM), ECF No. 46 at 51.

Here, however, Hazard's preparations were largely conducted at the behest of or with significant assistance by Denney.   While there is no doubt that Hazard attempted to recruit Individual-1 to travel and fight with him and Denney, he appears to have done so after Denney encouraged him to ("If you know any other guys that can go thats like us an will fight we could use them") and after Inidivdual-1 reached out to him ("Hazard are you going to dc").   And, while Hazard did obtain supplies specifically for use on January 6, 2021, it appears that Denney was largely responsible for their procurement and provided them to Hazard to use.   It does not appear

that Hazard engaged in either the significant fundraising efforts or the extensive coordination with leaders of other groups and militias that Denney undertook.  *See Denney*, 22-cr-70 (RDM), ECF No. 46 at 17-21.

The U.S. Probation Office calculated the Hazard's criminal history as category I, which is not disputed. Draft PSR ¶ 58.  Accordingly, the U.S. Probation Office calculated Hazard's total adjusted offense level, following a three-level downward adjustment for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1(a) and (b), as 27, and his corresponding Guidelines imprisonment range as 70-87 months. Draft PSR at ¶¶ 53, 89.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Donald Hazard's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   Hazard's assault of USCP officers standing between rioters and the Capitol building – Officer T.S., Technician T.L., and Sgt. T.L. – resulted in incredibly grave, long-lasting injuries to Officer T.S., among the worst sustained by police that day, and no doubt contributed to the rioters' ability to breach the line of officers and then the building itself only a few minutes later.   Following this incredibly severe assault, Hazard continued to engage with police, taunting officers and spraying at them on the West Front.   He

then entered the Capitol building and the Parliamentarian's office, the location of some of the worst ransacking and looting in the entire building.

In the days following January 6, 2021, Hazard expressed pride in his participation in in the "storming" of the Capitol, calling it "epic" and describing himself as "honor[ed]" and "blessed" to have taken part.   He boasted about fighting with police officers and forcing then Vice President Pence's evacuation from the Senate chamber.

The nature and circumstances of Hazard's offense were of the utmost seriousness, and fully support the government's recommended sentence of 57 months' incarceration.

### B.  Hazard's History and Characteristics

Hazard has three criminal convictions and three additional arrests.   Draft PSR ¶¶ 55-57, 60-63.   Two of those convictions are for assaults, although they occurred too long ago to factor into Hazard's criminal history category.   This history, which indicates that January 6, 2021 was not Hazard's first foray into violence, also weighs in favor of a lengthy term of incarceration.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration.   Hazard assaulted multiple police officers, causing significant and serious injuries to one, and breached the Capitol building, entering the Parliamentarian's office.   He then bragged on Facebook about his participation in the riot, boasting about how he had fought with police officers.   Hazard's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.       The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. First, although Hazard has a criminal history category of I, his history of arrest and conviction shows a clear history of assaultive behavior. *See* Section VI(B) *supra.*

Second, Hazard's social media statements after January 6 are not statements of contrition or remorse.   To the contrary, they are statements of pride and elation.   The only regret Hazard expressed was that he no longer had the photographs and videos he took that day.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

---

[8] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### E.        The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.        Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the

31

Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9]

---

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[10]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. Even amongst serious assaults, no previously sentenced case contains the same balance of aggravating and mitigating factors present here. However, the sentences in the following cases provide useful comparisons to the relevant sentencing considerations in this case.

As discussed above, as a result of Hazard's assault, Officer T.S. sustained extensive, severe, and prolonged injuries, the effects of which he still experiences today. These injuries were of such a caliber that the parties agreed that a 6-point offense level enhancement pursuant to U.S.S.G. § 2A2.2(b)(3)(E)[11] should apply. While many police officers and other individuals were injured as a result of the events of January 6, 2021, the Government has identified only three other cases in which it sought a 5 or more level enhancement pursuant to U.S.S.G. § 2A2.2(b)(3).

---

[10] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[11] That is, an injury whose degree is between "serious bodily injury," (an "injury involving extreme physical pain or protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation", U.S.S.G. § 1B1.1, Application Note 1(M)) and a "permanent or life threatening injury." U.S.S.G. § 2A2.2(b)(3).

*United States v. Head and Young*, 21-cr-291 (ABJ).   Head and Young both participated in an assault of an MPD officer in the passageway connecting the lower west terrace ("LWT") of the Capitol building and the interior of the building (the "Tunnel") and on the LWT.   Young entered the Tunnel at approximately 2:43 p.m., just after rioters first attempted to breach at that point, and participated in rioters' efforts to force their way into the Tunnel.   Young provided another rioter with a taser and showed that rioter how to use it.   He also directed a strobe light at the police line, threw an audio speaker towards officers (striking another rioter), and jabbed a long stick towards the police line.

Head entered the Tunnel slightly later, at approximately 3:07 p.m., after pushing his way through the crowd on the LWT.   Head put on a gas mask that a fellow rioter handed him and fought to get to the front of the mob, until he was directly up against the police line, where he pushed a riot shield into the line for several minutes.   At approximately 3:18 p.m., Head grabbed MPD Officer M.F. around the neck and pulled the officer off of the police line, into the crowd of rioters in the Tunnel and on the LWT, yelling "Hey!   I got one!"   There, Officer M.F. was assaulted by multiple individuals, including a rioter who tased the back of his neck and Young, who restrained Officer M.F. by the wrist.   Young then moved towards another officer who has been pulled into the crowd, USCP Officer M.M., and assaulted him, grabbing at his helmet and body, pushing him, and hitting him, while Head continued to try to assault Officer M.F.

Officer M.F. sustained significant and painful injuries as a result of this attack:   He experienced excruciating pain when the taser was repeated applied to his neck and the taser caused burn marks that resulted in scarring.   He collapsed and was unconscious for several minutes.

Young and Head each pled guilty to one count: a violation of 18 U.S.C. § 111(a)(1).   The Court determined that Young's total offense level was 24[12] and criminal history category was IV, resulting in a Guidelines range of 77-96 months' imprisonment.   The Government recommended a sentence of 86 months' imprisonment.   The Court imposed an 86-month sentence on Young. The Court determined that Head's total offense level was 24 and criminal history category was VI, resulting in a Guidelines range of 96 months' imprisonment.[13]   The Court imposed a 90-month sentence on Head.

---

[12]  Young and Head's plea agreements each included a 5-level enhancement pursuant to U.S.S.G. § 2A2.2(b)(3)(B) due to the extent of Officer M.F.'s injuries.   Both Young and Head received an additional two points due to their restraint of Officer M.F. pursuant to U.S.S.G. § 3A1.3. However, because each was convicted of a violation of 18 U.S.C. § 111(a), neither received a two-point enhancement pursuant to U.S.S.G. § 2A1.1(b)(7).

[13]  Head's range of 100-125 months was capped by the 8-year statutory maximum sentence for a

*United States v. Justin Jersey*, 21-cr-35 (RC).   Jersey, like Head and Young, was a participant in a multi-assailant assault on police officers on the LWT.   Approximately one hour after Head and Young's assaults, Jersey attacked the line of officers at the entrance to the Tunnel, grabbing MPD Officer A.W.'s face and knocking him to the ground, leaving him vulnerable to attack by other rioters who subsequently dragged Officer A.W. down a set of steps and into the crowd of rioters.   Jersey then obtained a weapon – a police baton – and used it to strike at other officers in the line.   He also collected Officer A.W.'s helmet, as well as the helmet and badge of other officers, and took them home with him as trophies.   Officer A.W. was subsequently transported to the hospital, where he was treated for a laceration to his head which required two staples to close.   He also sustained bruising on multiple areas of his body.   Due to his injuries, Officer A.W. was off duty until May 2021.   At that time, he returned to limited duty, but did not return to full duty until approximately July 2021.

Jersey pled guilty to one count: a violation of 18 U.S.C. § 111(a)(1) and (b).   The Court determined that Jersey's total offense level was 24[14] and criminal history category was I, resulting in a Guidelines range of 51-63 months' imprisonment.   The Government recommended a sentence of 63 months' imprisonment.   The Court imposed a 51-month sentence on Jersey.

Like Head, Young, and Jersey, Hazard did not use a weapon against Officer T.S. (although he later deployed pepper spray in the direction of other police officers), yet the assault resulted in significant injury to the officer.   Although there is some indication that Head, Young, and Jersey

---

violation of 18 U.S.C. § 111(a).

[14] Jersey's plea agreement also included a 5-level enhancement pursuant to U.S.S.G. § 2A2.2(b)(3)(B) due to the extent of Officer A.W.'s injuries.

anticipated violence,[15] they did not arrive at the Capitol wearing protective gear or carrying weapons.[16]   In contrast, it is clear that the possibility of violence is something that Hazard not only anticipated, but relished.   And he came prepared: At Denney's suggestion, he brought and wore protective gear (a helmet and tactical vest) and offensive supplies (pepper spray).   And, after the violence subsided, rather than expressing remorse or regret about his participation, Hazard expressed pride, bragging on Facebook that "I charged the cops and got in a fight with a lot of them."

Finally, Hazard's conduct should be viewed in comparison to that of his co-defendant, Lucas Denney.   It is clear that much of the planning and preparation for January 6 that Hazard undertook was at the urging of Denney.   Nor did Hazard engage in the extensive coordination with militia groups or fundraising efforts that Denney did.   However, on January 6, 2021, of his own accord, Hazard took it upon himself to attempt to breach the line of USCP officers standing between himself and his fellow rioters and the Capitol building.   During that attempt, he grabbed an officer, pulling him down the stairs with him and causing that officer to hit his head on the concrete.   Hazard's assault resulted in extensive, serious, and prolonged injuries to the officer, far greater than those inflicted by Denney during his course of conduct on January 6.

---

[15] In response to a Facebook contact's admonition to "stay safe and carry a small concealed club," Jersey responded "Love you / Yeah I'll have something w me."   *United States v. Jersey*, 21 Cr. 35 (RC), ECF No. 275 at 6.

[16] Young did provide a taser to a fellow rioter and showed him how to use it.   It is not clear where or when Young obtained the taser.   *United States v. Young* 21 Cr. 291 (ABJ), ECF No. 140 at 22.

## VII.   RESTITUTION

As agreed to by the parties, the Court should order Hazard to pay $2,000 to the Architect of the Capitol.   The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."[17] *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here.   The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Hazard must pay $2,000 in restitution to the Architect of the Capitol, which reflects in part the role Hazard played in the riot on January 6.[18] Plea Agreement at 8. As the Plea Agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the

---

[17] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), which "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, does not apply here. *See* 18 U.S.C. § 3663A(c)(1).

[18] The government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

Architect of the Capitol in mid-October 2022.   *Id.*   This restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol. *See* Draft PSR ¶ 111.

## VIII.   FINE

Hazard's conviction under Section 111 subjects him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b)(3). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). In assessing a defendant's income and earning capacity, a sentencing court properly considers whether a defendant can or has sought to "capitalize" on a crime that "intrigue[s]" the "American public." *United States v. Seale*, 20 F.3d 1279, 1284-86 (3d Cir. 1994).

A fine is appropriate in this case.   The Government has identified two fundraising webpages that appear to have been established for Hazard's benefit, which raised $450.   *See* Exhibits 18A and 18B   One, maintained by "Renee Norris," appears to have been taken down sometime after September 2022.   The other, maintained by "Sarah McAbee" is active as of May 10, 2023.   Hazard, who signed his message to donors "J6 Warrior," should not be able to capitalize on his participation in the Capitol breach in this way.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 57 months, three years of supervised release, $2,000 in restitution, a $450 fine and the mandatory $100 special assessment for the count of conviction

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    Benet J. Kearney
Assistant United States Attorney
1 Saint Andrew's Plaza
New York, New York 10007
Benet.Kearney@usdoj.gov
(212) 637 2260