**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | **Crim. No.  22-117 (RDM)** |
|  | ) |  |
| **v.** | ) |  |
|  | ) |  |
| **DONALD HAZARD** | ) |  |
|  | ) |  |
|  | ) |  |

<u>**MEMORANDUM IN AID OF SENTENCING**</u>

"I have always found that mercy bears richer fruits than strict justice."

Abraham Lincoln

Donald Hazard will be forever associated with a group he did not create – the Patriot Boys of North Texas ("PBONT").  He was recruited to join the group by Lucas Denney.  As Denney planned the trip to Washington, D.C., he gave Hazard the title "Sergent At Arms."  Hazard has no military or law enforcement background.  Hazard was not an officer in the group.  Denney gave him that title so that Hazard would have "a quasi-military rank to go along with the actual ranks held by other PBONT members who had served on active-duty."[1]

Being part of a group was a welcome idea to Donald Hazard.  It gave him a strong group to be a part of, which he missed in his early years.  Hazard was raised by his grandparents because his parents were not stable enough to raise him. While their household provided him with some grounding, the household was disrupted by instances of drug addiction and domestic violence.  It also gave him the opportunity to support his friend, Denney, whose group had been embraced by the Texas property owners along the border and previously embraced as additional security at local political events.[2]

By the end of 2020, Denney had gathered and relayed information that there had been violent clashes involving "ANTIFA groups" and that was the impetus behind him stating that they need to get "'anti-stabbing' vests" to protect themselves against counter-protestors.[3]  Looking back, this belief was consistent with many other beliefs that drove thousands of people to the Capitol on January

---

[1] *United States v. Lucas*, 22-cr-70, Affidavit of Lucas Denney, ECF 50-1, p. 8-9.
[2] *Id.* at 3-5.
[3] *Id.* at 7.

6th.  Months prior to the 2020 election, Former President Trump made several claims attacking the security of mail-in ballots and about the possibility of a rigged election.[4]  He tweeted a month before the election, that this would be "the most corrupt Election in American history!"[5]   On November 3, 2020, approximately, 74 million people voted for Trump in the 2020 election.  He declared that he won the election.[6]  By this time, 74 million people were acclimated to the idea that if Trump did not win, the election was stolen.

By the time of the election, "Trump's claim[s] [were] persuasive to many because the idea was already part of their DNA."[7]  Hence, by November 2020, it was "not that difficult to believe Biden did not win legitimately when your mind is made up and not open to persuasion, especially when you are continually bombarded with conspiracy theories and unsubstantiated claims by Trump, social media, and news sources designed to undermine the validity of the results."[8]

---

[4]     Steve Inskeep, *Timeline: What Trump Told Supporters For Months Before They Attacked*, NPR Politics, February 8, 2021, available at https://www.npr.org/2021/02/08/965342252/timeline-what-trump-told-supporters-for-months-before-they-attacked (last viewed on Aug. 4, 2022); see also Alexandra Hutzler, *Trump Started Tweeting About Election Fraud in April 2020, Eight Months Before Capitol Riot*, Newsweek, February 10, 2021, available at https://www.newsweek.com/trump-started-tweeting-about-election-fraud-april-2020-eight-months-before-capitol-riot-1568365.
[5]     John Woolley and Gerhard Peters, *Donald J. Trump Tweets of October 7, 2020,* at 02:14:11, The American Presidency Project, U.S. Santa Barbara, available at https://www.presidency.ucsb.edu/documents/tweets-october-7-2020)
[6]     Inskeep, footnote 2 *supra*.
[7]     Stephen Stathis, *Why do so many still believe the 2020 election was stolen?*, The Hill, April 11, 2022, available at https://thehill.com/opinion/campaign/3263802-why-do-so-many-still-believe-the-2020-election-was-stolen/.
[8]     Stathis, footnote 8, *supra*.

Hundreds of people have been sentenced for their actions on January 6th.
Many engaged in physical confrontations with officers on that day.  Hazard had no
plan to attack officers.  His actions were more of a reaction to what he saw that day,
as opposed to a plan to attack law enforcement, a group he thought he was similarly
situated with.  Based on the nature and circumstances of the offense, his
background, acceptance of responsibility, and the relevant sentencing factors
pursuant to 18 U.S.C. § 3553(a), the defense respectfully requests a sentence of 24
months, which would be a sentence not greater than necessary to address his
conduct in this case.

<u>**TIMELINE OF JANUARY 6th EVENTS**</u>

The timeline of January 6th is well-known.  Approximately 30,000 people were expected to attend.[9]  Around 6 a.m that day, numerous Trump supporters headed towards the rally at the Ellipse and "[m]any began gathering the night before."[10]  Prominent Trump supporters encouraged the crowd to march to the Ellipse and fight:

**11 a.m.**    High-profile figures of the Republican Party spoke directing the Trump supporters:
- Representative Mo Brooks (R-Ala.) urged "American patriots" to "**start taking down names and kicking ass**."[11]
- Katrina Pierson stated, "Americans will stand up for themselves and protect their rights, and they will demand that the politicians that we elect will uphold those rights, or **we will go after them**."[12]
- Amy Kremer, one of the organizers of the "Save America" rally and moderator of the "Stop the Steal" Facebook group, echoed others' calls for Republican

---

[9]    Though President Trump boasted that the rally numbered "hundreds of thousands of people", the rally's organizers projected just 30,000 participants.  *See* Andrew Beaujon, *Here's What We Know About the Pro-Trump Rallies That Have Permits*, The Washingtonian (Jan. 5, 2021), available at https://www.washingtonian.com/2021/01/05/heres-what-we-know-about-the-pro-trump-rallies-that-have-permits/.

[10]    George Petras, Janet Loehrke, Ramon Padilla, Javier Zarracina and Jennifer Borresen, *Timeline: How the storming of the U.S. Capitol unfolded on Jan. 6*, USA Today, Updated Feb. 9, 2021, available at https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022).

[11]    *See* Matthew Choi, *Trump is on trial for inciting an insurrection. What about the 12 people who spoke before him?*, Politico (Feb. 10, 2021), available at https://www.politico.com/news/2021/02/10/trump-impeachement-stop-the-steal-speakers-467554 (emphasis added).

[12]    *Id*. (emphasis added).

lawmakers to challenge the election result and **"punch back from Donald Trump."**[13]

- Lara and Eric Trump, the president's daughter-in-law and son, encouraged the attendees **to march on the Capitol to "stand up for this country and stand up for what's right."**[14]

- Donald Trump, Jr. narrated that "You have an opportunity today: **You can be a hero, or you can be a zero**. And the choice is yours but we are all watching."[15]

- Rudy Giuliani, President Trump's personal attorney also spoke, making his now-infamous call for "**trial by combat**."[16]

An hour later, former President Trump took the stage and implored attendees to "fight" for him, notably stating:

| | |
|---|---|
| **12 p.m.** | We will not let them silence your voices. . . **we're going to walk down to the Capitol**, and we're going to cheer on our brave senators and congressmen and women, and we're probably not going to be cheering so much for some of them. . . [if the election is certified], you will have an illegitimate president. That's what you'll have. And we can't let that happen.[17] |
| **1:10 p.m.** | And we fight. **We fight like hell. And if you don't fight like hell**, you're not going to have a country anymore. . . So we're going to, we're going to walk |

---

[13]   *Id.* (emphasis added).

[14]   *Id.* (emphasis added).

[15]   *Id.* (emphasis added).

[16]   *Id.* (emphasis added).

[17]   *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

down Pennsylvania Avenue. I love Pennsylvania Avenue. **And we're going to the Capitol**, and we're going to try and give.[18]

It is no surprise that after hearing these speeches, hundreds of people started marching toward the Capitol.

## LEGAL PRINCIPLES

### Sentencing Law

**1.  History – From unfettered discretion to Guideline bound.**

For 200 years, federal judges had wide discretion when it came to sentencing and could sentence how they saw fit and "there was virtually no appellate review of the trial judge's exercise of sentencing discretion."[19]  Former federal judge, Marvin E. Frankel was the "most influential critic[] of indeterminate federal sentencing" and in 1972, he published a "forceful …. indictment of the sentencing authority he himself exercised--powers which he described as 'almost wholly unchecked and sweeping' and which he found 'terrifying and intolerable for a society that professes devotion to the rule of law.'"[20]  Judge Frankel called for a "Commission

---

[18]    *See* Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part Of Impeachment Trial*, NPR (Feb. 10, 2021), available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial; see also Petras, *Timeline*, footnote 2 supra, https://www.usatoday.com/in-depth/news/2021/01/06/dc-protests-capitol-riot-trump-supporters-electoral-college-stolen-election/6568305002/ (last accessed on Feb. 28, 2022) (emphasis added).

[19]    Kate Stith & Steve Y. Koh, *The Politics of Sentencing Reform: The Legislative History of the Federal Sentencing Guidelines*, 28 WAKE FOREST L. REV. 223, 225 (1993).

[20]    *Id.* at 228.

on Sentencing" and the enactment of laws to make guidelines that would be "binding" on federal judges. [21] Congress answered Judge Frankel's call and in 1984 the Sentencing Commission was born. For decades, the U.S. Sentencing Guidelines were binding.

The era of binding guidelines ended seventeen years ago, when the Supreme Court held that "the Federal Sentencing Reform Act of 1984…ma[de] the Guidelines effectively ***advisory***." *United States v. Booker*, 543 U.S. 220, 245 (2005) (emphasis added). Under *Booker*, the "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." *Id*. at 264 (citing *See* 18 U.S.C. §§ 3553(a)(4), (5)). While holding that district courts should still consider the Guideline calculations and ranges for sentencing purposes, the Supreme Court in *Booker* held that courts must consider <u>all</u> the purposes of sentencing set forth in 18 U.S.C. § 3553(a). Overall, in light of *Booker*, courts must treat the Guidelines as <u>one</u> among several of the sentencing factors.

18 U.S.C. § 3553(a) provides that the Court must consider:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and

---

[21]     *Id.*

     (D) to provide the defendant with the needed educational and vocational training, medical care, or other correctional treatment in the most effective manner

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

     (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines— (i)issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; …

(5) any pertinent policy statement— …

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Several years after *Booker*, the Supreme Court made clear that the "Court's overarching duty" is to "'impose a sentence sufficient, but not greater than necessary,'" *Pepper v. United States*, 562 U.S. 476, 493 (2011) (quoting 18 U.S.C. § 3553(a)), to comply with "the four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation," *Dean v. United States*, 137 S. Ct. 1170, 1175 (2017); *see also* 18 U.S.C. § 3553(a)(2). In addition, the sentencing court may consider any "information concerning the background, character, and conduct" of the defendant, including age, educational and vocational skills, mental

and emotional conditions, and lack of guidance as a youth. 18 U.S.C. § 3661.

Congress has further provided that:

[t]he court, in determining whether to impose a sentence of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in Section 3553(a) to the extent that they are applicable, *recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation*.

18 U.S.C. § 3582(a) (emphasis added). With that limitation and considering all of the purposes of sentencing, the Court must impose a sentence that is "sufficient, *but not greater than necessary*, to comply with the purposes [of sentencing]." *Id.* § 3553(a) (emphasis added).

## 2. The Sentencing Guidelines are *only one factor*, thus Courts must not anchor themselves to the Guidelines.

Since *Booker*, the Supreme Court reaffirmed that the Sentencing Guidelines are merely one factor to be considered by district courts when fashioning a reasonable sentence and that the Sentencing Guidelines are not to be weighed more heavily than other sentencing factors. *See Rita v. United States*, 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007). A sentencing court shall not simply presume that a sentence within the Guideline range is automatically reasonable or that a sentence within the Guideline range is more reasonable than a sentence outside of the Guideline range. *Rita*, 551 U.S. at 338; *Gall*, 552 U.S. at 46. The sentencing court further shall not presume that a sentence outside of the Guidelines range is unreasonable. *Id.* By considering the Sentencing Guidelines along with all of the factors set forth 18 U.S.C. § 3553(a), "the sentencing court subjects the

defendant's sentence to the thorough adversarial testing contemplated by federal sentencing procedure." *Rita*, 551 U.S. at 351.

It is critical for sentencing courts to consider all sentencing factors and to not give undue weight to the Sentencing Guidelines because, as the Supreme Court has long emphasized that "'[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.'" *Gall*, 552 U.S. at 52 (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)); s*ee also United States v. Faison*, No. GJH-19-27, 2020 U.S. Dist. LEXIS 27643, at *4-5 (D. Md. Feb. 18, 2020)("But if judges are not careful, a rote application of the Guidelines can turn what is often a life-defining moment for the defendant into a check-the-box, formulaic calculation devoid of the individualized sentencing we strive for.").

Overall, judges are encouraged to resist "anchoring" the sentence on the guideline numbers. "Anchoring is a cognitive bias that describes the human tendency to adjust judgments or assessments higher or lower based on previously disclosed external information - the 'anchor.' Studies demonstrate 'that decisionmakers tend to focus their attention on the anchor value and to adjust insufficiently to account for new information.'" Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" and "Blind Sot" Biases in Federal Sentencing: A Modest Solution for Reforming a Fundamental Flaw*, 104 J. Crim. L. & Criminology 489, 495 (2014) (citations omitted).

It is important to distinguish the guidelines' intended, salutary effect -
promoting consistency and proportionality in sentencing - from the
unintended anchoring effect that the guidelines can exert. …
Anchoring leads to cognitive error not insofar as judges intentionally
use the guidelines in an advisory fashion, but instead when judges
irrationally assign too much weight to the guidelines range, just
because it offers some initial numbers.

*Id.* at 524 (inner quotation marks and citation omitted); *see also United States v.*

*Docampo*, 573 F.3d 1091, 1105 n.5 (11th Cir. 2009) (Barkett, J., concurring and

dissenting) ("Not only have district courts now become used to relying on [the

Guidelines], but the Guidelines inevitably have a considerable anchoring effect on a

district court's analysis").

## **ARGUMENT**

While the nature and circumstances of the January 6th events were indeed

serious, Mr. Hazard's particular actions that day, paired with his individual history

and characteristics lends itself to a sentence of 24 months, which would meet the

purposes of sentencing, without being overly punitive.

### I.   **Nature and Circumstances of Mr. Hazard's Offense**

The events of January 6th are seared into the nation's memory.  That day and

the days after resulted in lost lives and over 1 million dollars in property damage.

In addition, it caused trauma to politicians and staffers and their family members

who were present there and who watched from a far.

Mr. Hazard understands and would never minimize the impact of the event

on the nation.  Alone, Mr. Hazard was not the cause of January 6th.  He did not

create the rally or the idea that the election was stolen.  He did not direct thousands

of people to march to the Capitol.  Rather, he was recruited by Denney to be part of PBONT.

Notably, in another case, the government admitted that undercover police officers were directing individuals on the grounds and pushed protestors towards the Capitol.[22]  They also directed the crowd to the scaffolding where Mr. Hazard was. [23]

The video footage relied upon by the government shows that Mr. Hazard was not the only person in the scaffolding.  The officers tried to remove several individuals from the scaffolding and Mr. Hazard was not the sole contributor to the injuries the officers suffered.  The pictures also show Mr. Hazard being pushed and thrown down the stairs by Technician T.L..  Mr. Hazard accepts responsibility for his actions.  The Court should be note, however, that Mr. Hazard being thrown down the stairs by officers led to the injuries the officers sustained.

---

[22] Joseph M. Hanneman, *Undercover DC Police Officer Pushed Protesters Toward Capitol, Climbed Over Barricade: Court Filing*, The Epoch Times, March 7, 2023, p. 2 (also Exhibit 1).
[23] Id.  Body worn camera footage to be provided.



(Minute 00:09 of Government's Exhibit 6).

Technician T.L. is holding a baton as Mr. Hazard is pushed down the stairs.



(Minute 00:10 of Government's Exhbit 6).

14



(Minute 00:11 of Government's Exhbit 6).

The defense disagrees with the Probation Office's determination that Mr. Hazard should be assessed an additional 2 levels for "more than minimal planning." U.S.S.G. § 2A2.2(b)(1) note 2 provides that "more than minimal panning" means "more planning than is typical for commision of the offense in a simple form."  Here, Hazard and Denney prepared to come to the Capitol to attend the rally.  They were concerned about confrontations with counter-protest groups and wore gear to protect themselves.  The preparation was no different from other events they attended to assist law enforcment in Texas.[24]  There was no plan to commit the offense conduct of assaulting police officers.

## II.    <u>**Mr. Hazard's History and Characteristics**</u>

A few years after Donald Hazard was born, his parents separated and he was raised by his paternal grandparents.  While his grandparents provided some

---

[24] *See United States v. Lucas*, 22-cr-70, Affidavit of Lucas Denney, ECF 50-1

stability, there was drug abuse and domestic violence in the home.  As a result, he does not use drugs.  He is not close with his family and has had to rely on friends for support throughout his life.  One of his family members, named Uncle Joe, had disagreements with Hazard about his political beliefs.  He referred to Uncle Joe in his Facebook post.  It was not a reference to the current President.

Mr. Hazard is in criminal history category I.  He has no prior felony convictions and he has now served more time than he ever has.

### III.   The Requested Sentence Would Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed— . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  Incarceration is not required in order for a sentence to reflect the seriousness of the offense.  "A sentence of probation rather than incarceration can work to promote the sentencing goal of respect for the law by illustrating a rejection of the view that the law is merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."  *United States v. Bennett*, No. 8:07CR235, 2008 U.S. Dist. LEXIS 45302, at *12 (D. Neb. May 30, 2008) (citing *Gall*, 552 U.S. at 99).

To determine a just punishment for Mr. Hazard, the Court must consider the conditions under which an individual will serve time if the Court decides to incarcerate the individual.  Since the beginning of the COVID-19 pandemic, the

virus spread rampantly in detention facilities.  Thousands of BOP inmates have tested positive for COVID-19 and the latest BOP numbers show that 271 inmates have died from COVID-19.[25]   With the rise of COVID-19 variants, the risks of contracting the virus and death remain a serious concern for inmates.

### IV.   The Requested Sentence Would Provide Adequate Deterrence to Criminal Conduct and Protect the Public from the Unlikely Chance of Further Crimes of Mr. Hazard.

Under 18 U.S.C. § 3553(a)(2)(B) and (a)(2)(C), this Court must also consider "the need for the sentence imposed—. . . to afford adequate deterrence to criminal conduct...[and] to protect the public from further crimes of the defendant."  The national attention of this case has been a deterrent for Mr. Hazard.  Any time, someone searches his name on social media, several articles on January 6th appear.

There is nothing to indicate that a lengthy sentence will achieve deterrence. Even the Sentencing Commission determined that "[t]here is no correlation between recidivism and guidelines' offense level."[26]  Specifically, "[w]hether an offender has a low or high guideline offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected.  **The guidelines' offense level is not intended nor designed to predict recidivism**." [27]

The public will be protected while Mr. Hazard is being supervised by the

---

[25] *See* Fed. Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/ (last accessed December 8, 2021).
[26] See U.S. Sentencing Comm'n, *Measuring Recidivism: The Criminal History Computation Of The Federal Sentencing Guidelines*, at 15 (2004).
[27] *Id.* (emphasis added).

Probation Officer, which will further deter any criminal conduct.  The Court may also impose additional conditions of supervised release in order to ensure the safety of the community.

While "[p]rison is an important option for incapacitating and punishing those who commit crimes," evidence suggests that lengthy prison sentences do not have a "chastening" effect and "produce at best a very modest deterrent effect."[28]  With respect to specific deterrence, research shows conclusively that "[t]he *certainty* of being caught is a vastly more powerful deterrent than the punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "[i]ncreasing the severity of punishment does little to deter crime."[29]  Notably, "the great majority of studies point to a null or criminogenic effect of the prison experience on subsequent offending."[30]  Hence, "'[t]his reading of the evidence should, at least, caution against wild claims--at times found in "get tough" rhetoric voiced in recent decades--that prisons have special powers to scare offenders straight."[31]  A lengthy sentence is not needed to deter criminal conduct in this case.

## V.   The Pertinent Policy Statement Favors a Non-Custodial Sentence.

Congress requires the Commission to "insure that the guidelines reflect the general appropriateness of imposing a sentence **other than imprisonment in**

---

[28] *Five Things About Deterrence*, Nat'l Inst. Justice, U.S. Dep't of Justice, 1-2 (May 2016).
[29] Id.
[30] Daniel S. Nagin, Francis T. Cullen, Cheryl Lero Jonson, *Imprisonment and Reoffending*, 38 Crime & Just. 115, 178 (2009)
[31] Nagin, et al., *supra* note 35.

**cases in which the defendant is a first offender**....” 28 U.S.C. §

994(j)(emphasis added).  The Sentencing Commission has noted that offenders who

fall into Criminal History Category I are less likely to receive a straight prison

sentence. [32]

## VI.    The Requested Sentence Would Not Create An Unwarranted Sentencing Disparity

Sentencing Mr. Hazard to 24 months would not contribute to an unwarranted

sentencing disparity.  In the case of *United States v. Thompson*, 21-cr-461-RCL, the

defendant struck an officer with a baton and received a 46-month sentence.  In

*United States v. Languerand*, 21-cr-353-JDB, the defendant threw several objects at

officers, grabbed a police shield, and later excitedly described his actions on social

media.  He received a 44-month sentence.  In *United States v. Howard*, 21-cr-721,

the defendant struck an officer with a metal pole.  He received a 46-month sentence.

In *United States v. Denney*, 22-cr-70, the defendant struck an officer with a pole and

this Court sentenced Mr. Denney to 52 months.

## VII.    Request for Variance.

Mr. Hazard requests this Court vary down the guidelines for several reasons.

First, the guidelines overstate the conduct in this case.  As compared to other

assault cases on January 6th, Mr. Hazard’s conduct only slightly mets the definition

of assault.  As the video shows, he did not forcibly assault the officers in the

---

[32] *See* U.S. Sentencing Comm’n, *Recidivism and the “First Offender,”* (May 2004) p. 10, available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf (last accessed on April 29, 2021).

scaffolding.  His conduct was more consistent with impeding officers and his impeding led to bodily injuries of the officers.  However, when considering the number of people the officers encountered in the scaffolding and throughout that day, Mr. Hazard was not the sole contributor to their injuries.  In light of this, the Court should vary down the guidelines to adjust for the very limited conduct of assault as compared to others.

Second, the Court should vary down the guidelines because there was no plan to assault officers.  Third, Mr. Hazard is a low risk of recidivism and a lengthy sentence would increase the likelihood of recidivism.  "[W]hen prisoners serve longer sentences they are more likely to become institutionalized, lose pro-social contracts in the community, and become removed from legitimate opportunities, all of which promote recidivism."[33]  Alternatively, a shorter sentence would provide Mr. Hazard with the opportunity to start supervision sooner and restart his life.  Even in a case where a defendant had previously served time, a significant variance can be reasonable when the defendant "ha[d] never been in custody for any substantial period of time."[34]  The Court can impose strict conditions of supervision in order to meet the needs of sentencing and to mitigate against a lengthy sentence.

---

[33] Valerie Wright, *Deterrence in Criminal Justice*, The Sentencing Project, at 7 (Nov. 2010).
[34] *United States v. Collington*, 461 F.3d 805, 808 (6th Cir. 2006) (varying 68 months below the low-end of the guideline range).

## **Conclusion**

Considering the § 3553(a) sentencing factors, a sentence of 24 months, a term of supervised release, and restitution, is a sufficient, but not greater than necessary, sentence to satisfy the purposes of sentencing.

Respectfully submitted,

A.J. KRAMER
FEDERAL PUBLIC DEFENDER

_____/s/_____
Ubong E. Akpan
Assistant Federal Public Defender
625 Indiana Ave., N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500